CASE NO. 23-1360

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

MICHAEL SHIPTON,

Plaintiff-Appellant,

v.

BALTIMORE GAS AND ELECTRIC CO., EXELON CORPORATION,
EXELON BUSINESS SERVICES COMPANY, LLC, MICHAEL GROSSCUP,
EDWARD WOOLFORD, JEANNE STORCK, AND BINDU GROSS,
Defendant-Appellees.

---

On Appeal from the United States District Court
for the District of Maryland, Case No. 1:20-cv-01926-LKG

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

Tonya Baña
4305 Saint Paul Street
Baltimore, Maryland 21218
Telephone: (443) 890-8000
Facsimile: (410) 670-7573
E-mail: tonya@tonyabana.com

*Attorney for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1360      Caption: Michael Shipton v. Baltimore Gas & Electric Co., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michael Shipton
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☑YES ☐NO
      If yes, identify entity and nature of interest:

      Public utility Exelon Corporation is a defendant.

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Tonya Bana                          Date:      05/08/2023

Counsel for: Michael Shipton

[Print to PDF for Filing]

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT……………………………………..i

TABLE OF CONTENTS……………………………………………………….iii

TABLE OF AUTHORITIES…………………………………………….....vi

JURISDICTIONAL STATEMENT…………………………………….....1

ISSUES PRESENTED FOR REVIEW……………………………….....2

STATEMENT OF THE CASE………………………………………….....3

    I.     Introduction………………………………………………………...3
    II.    Statement Of Facts……………………………………………5
        A.    The Parties…………………………………………….....5
            1.    Plaintiff Michael Shipton………………………………5
            2.    The Corporate Defendants………………………………7
            3.    The Individual Defendants………………………………9
        B.    Overview Of Shipton's Employment With BGE…………...…10
            1.    Shipton Periodically Missed Work Due To Symptoms And Complications Related To Diabetes…………………………………………10
            2.    Shipton's Supervisors Did Not Advise Him That He Could Use Intermittent FMLA Leave For Absences Due To Diabetes For Over 2 Years………………………………………...14
            3.    Shipton Formally Requested To Use Intermittent FMLA Leave For Absences Due To Diabetes In July 2017 And Again In December 2017………………………………...16
            4.    Grosscup, Woolford, And Storck Made Baseless Allegations That Shipton Was Abusing His FMLA Leave Based On Nothing More Than His Taking FMLA Leave…………………………………..19
            5.    Grosscup Improperly Considered FMLA

Leave When Conducting Shipton's 2017
Performance Review, And Grosscup,
Woolford, And Storck Dismissed
Shipton's Complaints About His Review…………..…..24

6.   In April 2018, Shipton Formally Requested To Use
Intermittent FMLA Leave For Absences Due To
Neuropathy……………25

7.   The Exelon Companies Directed Shipton
To Submit A Letter From His Health
Care Provider Rescinding The Statements
Made In Her FMLA Certifications……………………..28

8.   Defendants Conducted A "Fact-Finding"
Investigation Into Shipton's FMLA Leave
Usage When They Knew That There Was
An Innocent Explanation For His Conflicting
Medical Documentation……………………………….29

9.   Defendants Fired Shipton For Misusing His
FMLA Leave When They Knew That His
Leave Was Used For An Approved Purpose………..…..33

III.   Procedural History…………………………………………...34

SUMMARY OF THE ARGUMENT……………………………………....36

ARGUMENT…………………………………………………….....…..37

I.   Standard of Review…………………………………………37

II.   The District Court Erred In Granting Summary Judgment
To Defendants And Denying Shipton Summary Judgment
As To His Claims Based On The Termination Of His
Employment ……………………………………………...37

A.   The District Court Erred In Applying The
"Honest Belief" Doctrine As A Defense To
Shipton's FMLA Claims……………………………...40

B.   Shipton Presented Direct Evidence That Defendants
Deliberately Interfered With His FMLA Rights And
Retaliated Against Him For Exercising His FMLA
Rights When They Fired Him……………………………43

C.   Defendants Cannot Meet Their Burden Of
Providing A Legitimate, Nondiscriminatory

iv

Reason For Shipton's Termination And,
Even If They Can, There Is Ample
Evidence Of Pretext…………………………………………..46

III.   The District Court Erroneously Found Shipton's
Claims Based On Events Prior To His Termination
Are Time-Barred Because It Ignored The Uncontroverted
Evidence Showing That Defendants Willfully Violated The
FMLA…………………………………………………………..50

IV.   The District Court Erroneously Found Exelon, EBSC
And The Individuals Defendants Were Not Shipton's
"Employer" Under The FMLA………………………………...52

CONCLUSION……………………………………………………….......54

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page**

*Adkins v. CSX Transp., Inc.*,
   70 F.4th 785, 795 (4th Cir. 2023)…………………………………………..42

*Calhoun v. United States DOL*,
   576 F.3d 201, 214 (4th Cir. 2009)………………………………………….40

*Fry v. Rand Constr. Corp.*,
   964 F.3d 239, 244, 249 (4th Cir. 200), *cert. denied*,
   141 S. Ct. 2595 (2021)…………………………………………………39, 43

*Heyer v. U.S. Bureau of Prisons*,
   849 F.3d 202, 208 (4th Cir. 2017)……………………………….……37

*Hodgens v. Gen. Dynamics Corp.*,
   144 F.3d 151, 160 (1st Cir. 1998)……………………………………38

*Kariotis v. Navistar Int'l Transp. Corp.*,
   131 F.3d 672, 680–81 (7th Cir.1997) …………………………….41-42

*Laing v. Federal Express Corp.*,
   703 F.3d 713, 717, 722-24 (4th Cir. 2013)………………………....39-40, 48

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128, 131-35 (1988)……………………………………….50-51

*McDonnel Douglas Corp. v. Green*,
   411 U.S. 792, 800-06 (1973) ………………………………………39, 43

*Mercer v. Arc of Prince Georges Cnty., Inc.*,
   532 F. App'x 392, 396-97, 399 (4th Cir. 2013) …………….……39, 41-42

*Merritt v. Old Dominion Freight Line, Inc.*,
   601 F.3d 289, 296 (4th Cir. 2010)…………………………………….48

*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471, 489 (1997)…………………………………………....48

*Rice v. Sunrise Express, Inc.*,
   209 F.3d 1008, 1017 (7th Cir. 2000)……………………..…………...38

*Sharif v. United Airlines, Inc.*,
   841 F.3d 199, 203 (4th Cir. 2016)……………………....……..38-39, 42

*T-Mobile Ne., LLC v. City Council of Newport News*,
   674 F.3d 380, 384-85 (4th Cir. 2012)……………………………...……37

*Vannoy v. Federal Reserve Bank of Richmond*,
   827 F.3d 296, 304-05 (4th Cir. 2016)…………………….………..39

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252, 267-68 (1977)……………………………….…………48
*Waag v. Sotera Defense Solutions, Inc.,*
    857 F.3d 179, 191 (4th Cir. 2017)……………………….…………39
*Warch v. Ohio Cas. Ins. Co.,*
    435 F.3d 510, 520 (4th Cir. 2006)…………………………………..45
*Yashenko v. Harrah's NC Casino Co., LLC,*
    446 F.3d 541, 546, 549-51 (4th Cir. 2006)……………………..38-40

**Statutes**

28 U.S.C. § 1291…………………………………………………...1

28 U.S.C. § 1331…………………………………………………...1

29 U.S.C. § 2601………………………………………………....1, 37-38

29 U.S.C. § 2611………………...………………………..…………52

29 U.S.C. § 2612……………………………………….…………...37

29 U.S.C. § 2615…………………………………………..38-39, 52

29 U.S.C. § 2617………………………………………………...…..50

**Regulations**

29 C.F.R. § 825.104…………………………………………………53

29 C.F.R. § 825.106…………………………………………………53

29 C.F.R. § 825.220(c)…………………………………..…………39

**Rules**

Fed. R. Civ. P. 56(a)…………………………………………………37

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction because Michael Shipton ("Shipton" or "Plaintiff") appeals from a final order of the United States District Court for the District of Maryland disposing of all of his claims.

The district court properly exercised subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 because Shipton asserted claims for relief arising under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

The final order disposing of Shipton's claims was entered on March 31, 2023. J.A.738.[1]  Shipton timely filed a notice of appeal the same day. J.A.740.

---

[1]      "J.A." refers to the Joint Appendix.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in resolving disputed facts in favor of Defendants and failing to consider evidence offered by Plaintiff.

2.    Whether the district court erred in applying the "honest belief" doctrine as a defense to Plaintiff's claims when the Fourth Circuit has not recognized that defense in the context of FMLA claims.

3.    Whether the district court erred in granting summary judgment to Defendants and denying summary judgment to Plaintiff when the evidence clearly shows that Defendants' stated reason for firing him was false and there is direct evidence of discrimination.

4.    Whether the district court erred in determining that Plaintiff's claims based on events that occurred prior to his termination are time-barred because he failed to present any evidence that Defendants willfully violated the FMLA.

5.    Whether the district court erred in finding Plaintiff's employer is the only proper defendant under the FMLA.

2

## STATEMENT OF THE CASE

### I.    Introduction

This appeal requires the Court to address whether an employer's conclusory assertion that it terminated an employee based on an "honest belief" that the employee was misusing his FMLA leave can defeat summary judgment where there is objective evidence that the employer knew that the employee's leave was used for an approved purpose.

Michael Shipton ("Shipton" or "Plaintiff") has brought claims against his former employer, Baltimore Gas & Electric Co. ("BGE"), BGE's parent company, Exelon Corporation ("Exelon"), affiliate Exelon Business Services Company, LLC ("EBSC" and together with BGE and Exelon, the "Exelon Companies" or "Corporate Defendants") and four of the Exelon Companies' current or former employees (the "Individual Defendants" and together with the Corporate Defendants, "Defendants") for violations of the Family and Medical Leave Act (the "FMLA" or "Act") stemming from the termination of his employment in June 2018.

The facts of this case are deceptively complicated, but the material facts are simple and uncontested. Defendants maintain that BGE terminated Shipton because they had an "honestly-held belief" that he had misused his FMLA leave in early 2018.  Shipton, who is diabetic and often missed work due to diabetes-related symptoms and complications, had requested and received approval to take

3

intermittent FMLA leave for absences due to diabetes. He was using FMLA leave for neuropathy, which is a common symptom or complication of diabetes, in the months leading up to his discharge. After alleged inconsistencies in his medical paperwork raised questions about his need for leave, the Exelon Companies investigated his FMLA leave usage and medical documentation. The evidence obtained and reviewed in the course of the investigation verified that he was using his FMLA leave for absences due to neuropathy. Further, the contemporaneous notes from the investigation show that he truthfully reported that he was using his FMLA leave for neuropathy and that Defendants knew that his leave was used for an approved purpose when they fired him.

These undisputed facts establish that Shipton is entitled to judgment as a matter of law that Defendants interfered with his rights and retaliated against him for exercising his rights when they terminated him based on pretextual allegations that he had misused his leave. However, the district court determined that Shipton cannot prevail on either one of his claims based on the termination of his employment because it uncritically accepted Defendants' assertion that BGE terminated him based on an "honestly-held belief" that he had misused his leave. The district court also determined that his claims based on events that occurred prior to his termination are time-barred because he failed to present any evidence that Defendants willfully violated the FMLA and that he failed to present any evidence

4

that Exelon, EBSC, and the Individual Defendants were his "employer" under the FMLA. The district court granted summary judgment to Defendants as to all of Shipton's claims, denied Shipton's cross motion for summary judgment as to his claims based upon the termination of his employment, and dismissed his amended complaint in its entirety.

Shipton respectfully submits that this Court should find that the evidence clearly establishes that he is entitled to judgment as a matter of law on his claims based upon the termination of his employment, reverse and vacate the district court's grant of summary judgment to Defendants, reverse the district court's denial of Shipton's cross motion for summary judgment, and remand the case to the district court with instructions to enter judgment in Shipton's favor as to the claims based upon his termination and allow the case to proceed to trial on the remaining claims and as to damages only with respect to the claims based upon his termination.

## II.    Statement Of Facts[2]

### A.    The Parties

#### 1.    Plaintiff Michael Shipton

Shipton is a professional utility worker with over fifteen years of experience installing and repairing wire, conduit, and pipe for major companies in the telecommunications and utility industries. J.A.14, 27, 67-69. Before he relocated

---

[2]    Unless indicated, the following facts are undisputed.

to Maryland to pursue a career with BGE, he spent two years working for Danella Line Services in New Jersey, five years working for Verizon in New Jersey, and another two years working for Danella Line Services in Pennsylvania.  J.A.14, 27, 67-69.  Further, within a few months of being terminated by BGE, Verizon rehired him.  J.A.14, 27.  He is a highly skilled, dedicated and valued employee who was well-qualified for the work he performed at BGE.  J.A.14, 27, 67-69, 119, 286.

Shipton was employed by BGE from March 2014 until June 2018.  J.A.12, 26, 35-36. After successfully completing the training program for his position, he progressed from being a Trainee to an Underground Gas Mechanic in June 2015. J.A.14, 27, 35-36, 75.  By all accounts, the Underground Gas Mechanic position is an extremely physically demanding job that often requires employees to work long hours.  J.A.119, 286-89, 446, 569. The job description states that employees must pass a "strenuous physical and respirator exam" and have the "[c]apability to perform work requiring considerable physical effort."  J.A.288-89.  In the performance of the essential job functions employees are frequently required to bend, stoop, climb, kneel, squat, crawl, and crouch and lift anywhere from 25 to 100 lbs..  J.A.288-89.  Shipton testified that the position is "probably the most physical" job at BGE and involves "a lot of heaving lifting, shoveling, digging holes, backfilling, carrying heavy equipment." J.A.119.

Shipton was first diagnosed with diabetes in the early 2000s. J.A.72, 120.  As a result of his diabetes, he has experienced many of the common symptoms and complications of the disease, including, but not limited to, feeling "weak," "shaky," or "tired," getting "the sweats and the shakes" and "clammy," fatigue, headaches, nausea, unstable blood sugars, hypoglycemia or low blood sugar, hyperglycemia or high blood sugar, and neuropathy or nerve damage in his hands and feet caused by prolonged high blood sugar levels.  J.A. 72-75, 93, 96, 120-22, 124, 633, 641.  In addition, because his immune system is compromised as a result of his diabetes, he is more susceptible to other illnesses, such as colds, infections, and viruses, and more likely to have complications and more serious cases of these illnesses.  J.A.82-85, 120.

## 2.    The Corporate Defendants

BGE is Maryland's largest natural gas and electric utility.  J.A.12, 26, 35. BGE employs approximately 3,200 employees.  J.A.12, 26, 35.  Exelon is a public utility holding company.  J.A.12, 26.  At the time of the underlying events, Exelon employed approximately 34,000 people nationwide.  J.A.12, 26.  EBSC is a shared service company that provides a variety of support services to all Exelon subsidiaries, including BGE.  *Id.*  At all relevant times, BGE and EBSC were wholly-owned subsidiaries of Exelon.  J.A.12, 26, 35, 277.

Exelon exercises significant control over BGE's employees, including, but not limited to, promulgating policies and rules, employee supervision and discipline, and maintenance of employee records. J.A.38-39, 325-421, 645-653. Exelon has developed companywide policies and a Code of Business Conduct that apply to all employees of any Exelon company, including employees of BGE. J.A.326, 342, 646. Exelon also provides BGE with human resources and legal support through EBSC. J.A.282-83. Of particular import here, Exelon has implemented a Family and Medical Leave Policy that provides the guidelines for employees who need leave for reasons that qualify for protection under the FMLA. J.A.645-653. In addition, Exelon Occupational Health Services ("Exelon OHS") reviews and responds to employee requests for FMLA leave and maintains any records related to such requests. J.A.166-202, 210-18, 291-99, 570, 629-43.[3]

---

[3]  The evidence shows that Exelon has "leave coordinators" that handle communications with BGE employees related to FMLA applications and the contemporaneous business records produced by the Exelon Companies related to Shipton's FMLA requests and other confidential health information conclusively show that these records were created and maintained by Exelon Corporation's "Occupational Health Services." J.A.570, 629-643. However, the Exelon Companies sometimes use the abbreviation "OHS" to refer to "BGE's Occupational Health Services Department," the "Office of Health and Safety," and "Exelon's Occupational Health and Safety Department." J.A.37, 49, 367, 370. Further adding to the confusion, the Exelon Companies have not disclosed the specific entities that employed the individuals with whom Shipton interacted when he applied for FMLA. J.A.42-43.

8

### 3.    The Individual Defendants

In 2017 and 2018, Shipton reported to Michael Grosscup ("Grosscup"). J.A.36, 80. Grosscup is a Supervisor in BGE's Gas Construction & Maintenance Department, a position he has held since 2004. J.A.42, 277, 280, 429, 703. He conducted Shipton's annual performance reviews for 2016 and 2017, and he was responsible for monitoring and properly tracking Shipton's FMLA leave. J.A.280-81, 203-209, 293, 298-99. In addition, he provided information during the investigation of Shipton's FMLA leave, and he participated in or ratified the decision to terminate Shipton's employment. J.A.42, 51, 53, 281, 703, 712, 714.

At all relevant times, Grosscup reported to Edward Woolford ("Woolford"). J.A.36, 81. Woolford is a Manager in BGE's Gas Construction & Maintenance Department. J.A.42, 280, 703. He has held various positions in management going back to the early 2000s. J.A.481-82. He also participated in or ratified the decision to terminate Shipton's employment. J.A.42, 51, 281, 703, 712.

Jeanne Storck ("Storck") was the Human Resources Business Partner who supported the Gas Construction & Maintenance Department during the relevant time period. J.A.42, 284, 703. She assisted with the investigation of Shipton's FMLA leave, and she participated in the decision to terminate his employment. J.A.42, 51, 53, 284-85, 703, 712, 714.

9

Bindu Gross ("Gross") was employed by EBSC as a Labor Relations Principal from April 2018 until January 2020.   J.A.42, 563, 703.   In that position, he principally served as an advocate for the Exelon Companies during collective bargaining negotiations. J.A.562-64, 584-85.[4]   Although he was an employee of EBSC, he was "embedded with BGE," he had an office at BGE headquarters, and he primarily served BGE.   J.A.562-64. He led the investigation of Shipton's FMLA leave, and he participated in the decision to terminate Shipton's employment. J.A.42, 51, 53, 282-83, 703, 712, 714.[5]

### B.    Overview Of Shipton's Employment With BGE

#### 1.    Shipton Periodically Missed Work Due To Symptoms And Complications Related To Diabetes

Throughout Shipton's employment with BGE, he periodically missed work for diabetes-related symptoms and complications, including, but not limited to, nerve pain or neuropathy.   J.A. 15, 27-28, 83-85, 92-94, 96-101, 300, 304, 307, 314,

---

[4]    Gross is a lawyer by training but testified that he was not acting "in the capacity of a lawyer" and "wasn't providing [] legal advice on what to do" in his position with BSC. J.A.564.

[5]    Gross testified that Denise Galambos ("Galambos"), who then served as the Vice President of Human Resources at BGE, hand-picked him to conduct the fact-finding investigation of Shipton's FMLA leave usage since "it was a case with delicate facts because there's medical leave involved, and she wanted to make sure that somebody who was experienced with asking questions and evaluating credibility was involved on BGE's side."   J.A.43, 562-63, 714. He also testified that the fact-finding investigation of Shipton's FMLA leave was the only fact-finding investigation he participated in during his employment with EBSC. J.A.563.

10

320, 633, 641-42. He also missed work due to severe colds, viruses, stomach issues, and infections that he "would pick up due to [his] weak immune system" and often required him to visit a health care provider and take prescription medication. J.A.83.96. For example, he was out for three days and placed on antibiotics and a steroid for pneumonia in April 2014. J.A.629. In March 2015, he was out for bronchitis. J.A.15, 28, 83. He was out for eight days and hospitalized for several days for viral meningitis in April 2015, and he missed another nine days and was placed on antibiotics and a steroid for an infection due to ongoing issues related to the meningitis in May 2015. J.A.81-82, 166-68, 629-30. In December 2015, he was out with serous otitis. J.A.15, 28, 83.[6] He was out for sinusitis in March 2016. J.A.15, 28, 83.[7]

During discovery, Defendants deposed three of Shipton's healthcare providers who treated him for diabetes-related symptoms and complications and other illnesses that could have prevented him from performing his job duties at BGE. Physician's assistant Chelsey Hamershock ("Hamershock"), who was Shipton's primary healthcare provider in 2017 and 2018, testified that he had many symptoms and complications of diabetes. J.A.92, 177, 192, 233-34, 236-43, 252.[8] She testified that the symptoms of diabetes include fatigue, nausea, headaches, hypoglycemia and

---

[6]     Serous otitis is essentially a severe ear infection. J.A.83.
[7]     Sinusitis is a severe sinus infection. J.A.83.
[8]     Hamershock worked under the supervision of Dr. Yoon Kim. J.A.83, 91, 226.

hyperglycemia and that Shipton exhibited or reported experiencing all of those symptoms in the course of his treatment.  J.A.236, 239, 243, 246-47, 250-51.  She testified that both hypoglycemia and hyperglycemia could render Shipton unable to perform his job functions.  J.A.249 ("Q. Do you hold any opinions as to whether or not Mr. Shipton's medical conditions periodically rendered him unable to perform his job functions? A. Yes. Q. What is your opinion? A. At times when he was experiencing severe highs or lows, that he could have been unable to render his job functions.").  She also testified that neuropathy or nerve pain is a complication of diabetes and that Shipton increasingly complained of nerve pain in his feet in late 2017 and early 2018.  J.A.230, 234, 236-37, 239-43, 250-51.  Further, she testified that diabetics are more likely to contract colds, flus, infections and viruses and more likely to have serious cases of such illnesses and that she treated Shipton a few times for illnesses like bronchitis and strep throat.  J.A.235, 248, 252.

Dr. Preethi Kadambi ("Dr. Kadambi") is a specialist in endocrinology, diabetes, and metabolism who treated Shipton for diabetes in March and April 2018. J.A.593, 597, 599, 602, 605-07, 612.  Dr. Kadambi testified that both hypoglycemia and hyperglycemia can cause dizziness and fatigue, that hypoglycemia, hyperglycemia and neuropathy are all symptoms and/or complications of diabetes, and that all of those symptoms and/or complications are properly considered part of "flare-ups" associated with diabetes.  J.A.613.  She also testified that neuropathy is

12

usually a chronic condition and may be aggravated when a patient's "sugars are running high" and that Shipton had "persistent neuropathy" and related symptoms, including numbness, tingling, and burning.  J.A.603, 612.  In addition, she testified that all of those diabetes-related symptoms and/or complications could render a diabetic unable to perform his job duties. J.A.606-07 ("So in diabetes, complications can cause people to miss work…. there can be things from the disease, which I'm not able to predict, which can cause him to miss work.").  She also testified that poorly controlled diabetes increases a person's risk of infections and makes it more likely that a person would have more serious cases of any infections or viruses he contracted.  J.A.614.[9]

Physician's assistant Jacqueline Fisher ("Fisher") treated Shipton for sinusitis and bronchitis in June 2018.  J.A.623.  She testified that having diabetes made him more vulnerable to infections and viruses, more likely to have serious cases of those

---

[9]    Defendants do not dispute that Shipton has diabetes nor do they dispute that he suffered from a variety of diabetes-related symptoms and complications that periodically caused him to miss work. In their answer to the amended complaint, Defendants acknowledged that they do not possess any knowledge or information sufficient to deny that Shipton periodically missed work due to diabetes and diabetes-related symptoms and complications. J.A.15, 27-28. Although Defendants' answer raised boilerplate defenses in which they vaguely asserted that Shipton's claims are barred due to his "dishonesty or fraud in asserting an entitlement to and usage of FMLA leave" and maintained that they "honestly believed" that he "was fraudulent or dishonest with respect to his use of FMLA leave and representations" to them, their answer did not provide any facts demonstrating that those defenses are actually applicable here.  J.A.32-33.

13

illnesses, and more likely to experience complications. J.A.624-27. She also testified

that when she treated him, they discussed the fact that being a diabetic could make

him more susceptible to infections.  J.A.24.  Further, she testified that she prescribed

him antibiotics because he is a diabetic and more at risk for bacterial infection.

J.A.626.

**2.      Shipton's Supervisors Did Not Advise Him That He Could Use Intermittent FMLA Leave For Absences Due To Diabetes For Over 2 Years**

Although Shipton told his supervisors that nearly all of his absences related to

diabetes and related complications, he was not informed that he could use

intermittent FMLA leave for periodic absences due to a chronic condition for over

two years. J.A.16, 80-86.[10]  At the same time, Shipton's supervisors continued to

---

[10]      Woolford's declaration in support of Defendants' summary judgment motion asserted that Shipton "was provided with FMLA eligibility notices and notices of his rights under the FMLA" in 2014 and early 2015. J.A.278. However, Woolford has no personal knowledge of Shipton's applications for FMLA leave.  J.A.42-43, 168, 202, 249, 471. Further, Woolford's general observation that Shipton received these notices does not contradict Shipton's deposition testimony in which he said that he informed his supervisors that he was diabetic early in his career at BGE. J.A.80-86. In any event, Shipton does not dispute that the Exelon Companies notified him of his right to take continuous FMLA leave when he missed several weeks of work due to contracting viral meningitis in March 2015. J.A.81-82, 629.  In that instance, someone from Exelon OHS affirmatively contacted him to initiate the process to apply for FMLA leave. *Id.*  However, the district court misunderstood the evidence when it determined that it "is undisputed that Plaintiff was granted a FMLA designation beginning in April of 2015 for leave attributed to sicknesses related to diabetes." J.A.744.   The Exelon Companies' contemporaneous business records related to Shipton's FMLA request plainly show that Defendants did *not* attribute his leave for viral meningitis and related complications to his diabetes. J.A.629-30.

14

criticize him and give him poor performance reviews based on his health-related absences, which negatively impacted his career opportunities and compensation. J.A.37, 79, 86-89, 203-09, 475.

For instance, when Shipton progressed from a trainee to a mechanic in June 2015, he received a smaller salary increase than the other trainees in his training class. J.A.86. In early 2016, he received his annual performance review for 2015, which specifically noted that "his absences in 2014 and 2015 [had] negatively impacted the business" and that management "had to move crew members from other crews to help complete jobs in his absence." J.A.16, 28, 84.

Michael Grosscup became Shipton's supervisor in late 2016. J.A.16, 26. During a conversation in Grosscup's office, Shipton informed Grosscup that nearly all of his absences were due to his diabetes and related complications. J.A.86, 120, 425, 436-37, 444-45. Shipton specifically told Grosscup that he needed to miss work because he had "been having issues with [his] diabetes" and "diabetic related issues that were affecting [his] immune system" and "causing [him] to be sick more often

_____

Further, the records show that when Shipton briefly returned to work and reported to OHS for a meeting with Lead Nursing Supervisor Angela Mikulski, NR, BSN ("Mikulski") in May 2015, he specifically told Mikulski that he had diabetes mellitus and that he had a "decreased immune response" as a result of his diabetes, which further supports Shipton's testimony that he informed the Exelon Companies that he was more susceptible to infections and other illnesses as a result of having diabetes. J.A. 43, 49, 84-86, 120, 630. There is no indication that Mikulski gave Shipton any information about his right to take intermittent FMLA leave for a chronic serious health condition at that time. J.A.630.

than regular." J.A.86, 120. Still no information was given to him regarding his right to take intermittent FMLA leave.

In early 2017, Shipton received his annual performance review for 2016, which again criticized him for his health-related absences. J.A.16, 28, 87-88. Shipton complained to Grosscup, but Grosscup just pointed out that the negative comments were made by his former supervisor and said, "Don't shoot the messenger." J.A.16, 26, 87-89. Still no information was provided regarding his right to take intermittent FMLA leave. J.A.16.

> ### 3. Shipton Formally Requested To Use Intermittent FMLA Leave For Absences Due To Diabetes In July 2017 And Again In December 2017

In 2017, Shipton's diabetes was poorly controlled, his blood "sugars were very high" and "fluctuating," and when his medications were adjusted to bring down his numbers he "occasionally" had "episodes of hypoglycemia," he was "having a lot of dips" and "low blood sugars" and "felt weak, tired," and "drained," he "would get the sweats and the shakes," and he experienced nausea and headaches. J.A.74, 91-94, 96, 231-34, 236-39. He also had bouts of neuropathy in his hands, legs and feet and increasingly experienced severe nerve pain in his legs and feet due to neuropathy. J.A.74-75, 233-34, 236-37, 239, 241.

During an office visit with Hamershock in April 2017, he complained that "his feet were sore, hot and numb." J.A.236-37. During another office visit with

Hamershock in July 2017, his lab work showed "[w]orsening diabetic control" and he mentioned that he was "in jeopardy of losing his DOT" driving qualifications because his blood sugar was "uncontrolled and high." J.A.237-38. He also reported increased numbness and tingling. J.A.237. Around that time, Hamershock referred him to Dr. Kadambi for further treatment for neuropathy and for being an "uncontrolled diabetic." J.A.75, 124, 238, 247, 253.

By mid-2017, Shipton had nearly exhausted his annual sick leave allotment. J.A.86. Only then did Grosscup inform him that he could request to use intermittent FMLA leave for absences due to diabetes. J.A.28, 86, 444.[11]

Shipton requested the necessary paperwork to apply to use intermittent FMLA leave for absences due to diabetes on July 24, 2017, and he received written notice from FMLA Coordinator Kim Baudek ("Baudek") confirming that he met the eligibility requirements for FMLA leave the next day. J.A.90-91, 169-72, 638. On August 18, 2017, he submitted a supporting certification completed by Hamershock. J.A.90-94, 173-79, 638. On August 25, 2017, the Exelon Companies notified him

---

[11]    The parties dispute whether Grosscup's overall attitude regarding Shipton's use of intermittent FMLA leave was supportive or hostile. In Grosscup's declaration, he claimed that he "encouraged" Shipton to apply for FMLA leave "to ensure that his absences were covered." J.A.280. Shipton acknowledges that Grosscup recommended that he apply for FMLA leave in/around July 2017, but maintains that Grosscup was hostile towards him based solely on his need for and use of leave for his health-related absences. J.A.86-89, 97-99, 102, 111.

that his request had been approved.  J.A.94, 181-86, 638.  The approval covered any absences from August 18, 2017 through February 18, 2018.  J.A.181-86, 631, 638.

By late 2017, Shipton was experiencing sudden attacks of nerve pain, which he described as "shooting, stabbing pains" in his feet that caused his toes to "curl" and his calves to "cramp up," on a daily basis.  J.A.75, 93.  On September 26, 2017, he had an urgent care visit with Hamershock due to severe nerve pain or paresthesia of the upper leg, including "sharp pains in his outer thighs" and "a burning feeling" that started about a week earlier, and he was prescribed a steroid. J.A.241.[12]  He also complained of "nerve pain" and "increased paresthesia in his feet and legs" during a routine office visit with Hamershock on December 14, 2017.  J.A.241-42.

On December 20, 2017, Shipton requested the necessary paperwork to apply to use intermittent FMLA leave for absences due to diabetes and diabetes-related complications, and he received written notice from FMLA Coordinator Trisha Gagliardo ("Gagliardo") confirming that he met the eligibility requirements for FMLA leave the next day.  J.A.95, 187-90, 643.  On January 3, 2018, he submitted another supporting certification from Hamershock. J.A.95-96, 191-95.  On January 5, 2018, the Exelon Companies notified him that his request had been approved.

---

[12]      Paresthesia refers to numbness or tingling and is a symptom of neuropathy.  J.A.239.

18

J.A.96, 196-201, 643.  The approval covered any absences from January 2, 2018 through July 2, 2018.  J.A. 196-201, 631-32, 643.[13]

### 4. Grosscup, Woolford, and Storck Made Baseless Allegations That Shipton Was Abusing His FMLA Leave Based On Nothing More Than His Taking FMLA Leave

Whenever Shipton used leave, he complied with all of the Exelon Companies' leave notification procedures and truthfully reported the specific reasons why he took leave.[14] More specifically, he notified Grosscup and the Exelon Absence Center that he would be absent at least one hour before the start of his shift.  J.A.84-85, 185. Although he was only required to say that an absence was for an FMLA-covered reason (either by mentioning that he needed to take "FMLA leave" and/or that he needed to miss work for "diabetes") when he used FMLA leave, he usually provided the specific reasons for his absences.  J.A.85, 95, 120, 185.[15]  In addition, anytime

---

[13]     All of the witnesses with knowledge of the condition for which Shipton initially requested to take intermittent FMLA leave unanimously testified that he said he needed FMLA leave for absences due to diabetes. J.A.86, 93-94, 120, 240, 436-37, 444-45. Furthermore, the Exelon Companies' contemporaneous business records related to Shipton's FMLA applications in July 2017 and December 2017 reflect that he requested and received approval to take intermittent FMLA leave for absences due to "uncontrolled diabetes."  J.A.631-32, 638, 643.

[14]     Shipton's unrebutted testimony demonstrates that he consistently complied with all of the Exelon Companies' procedures for reporting his absences. J.A.124.

[15]     Shipton specifically testified that "most of the time when [he] called out," he gave Grosscup "very specific" information about what "was going on with [him] physically."   J.A.85, 120. Notably, BGE's policy states that employees must personally speak with their immediate supervisor when providing notice of their absences, but Shipton testified that most supervisors allowed their subordinates to text them about any absences and that he sometimes texted Grosscup regarding his

he was out for four or more consecutive business days, he submitted a doctor's note. J.A.238, 629, 652.

Shipton's actions to report his absences and use FMLA leave were consistent with the instructions that he received from Exelon OHS, which made clear that he should report that he was using FMLA leave each time that he was absent for the serious health condition for which he requested to take FMLA leave.  J.A.101-02, 124, 181-82, 185-86, 196-97, 200-01, 291-92, 296-97, 586, 645. His actions also complied with the requirements of Exelon's Family and Medical Leave Policy, which states that an employee must provide notice of the need for unforeseeable leave to his supervisor.  J.A.645. Further, as Shipton's supervisor, Grosscup was the person ultimately responsible for accurately tracking and monitoring Shipton's FMLA leave usage.  J.A.202, 293.

Although Shipton fully complied with all of the Exelon Companies' requirements for reporting his absences and using FMLA leave, contemporaneous emails show that Grosscup and Woolford reached out to Storck in/around November 2017 and made baseless allegations that Shipton was abusing his FMLA leave by

---

absences. J.A.85. Both Shipton and Grosscup produced copies of text messages that corroborate Shipton's testimony that he routinely disclosed the specific reasons that he took sick leave and/or FMLA leave when he notified Grosscup of his absences. J.A.300-24.  For instance, Shipton notified Grosscup that he used FMLA leave for "nerve pain in his leg" in September 2017. J.A.300.  He also notified Grosscup that he took FMLA leave for "foot issues" in March 2018. J.A.307, 320.

"calling out for unpaid FMLA leave during the week only to be making it up on the weekends with paid overtime" and "performing work for a side business during this time off." J.A.13, 26, 644. Storck then sent Gagliardo an email in which she reiterated Grosscup's allegations and added that Shipton "takes full advantage of sick time and unpaid sick time," his "FMLA approval [] is very generous, and he seems to be using it to its fullest." *Id.* [16]

Although Gagliardo acknowledged that the Exelon Companies had to approve Shipton's FMLA request, Gagliardo still advised Storck that she could place Shipton under surveillance if she obtained approval. *Id.* Storck then sent an email to Galambos and Director of Human Resources Marsha Byas ("Byas") in which she said, "There is a situation in Gas (Mike Shipton) where there is a strong belief that the employee is misusing FMLA leave as there is a recurring history of patterned absence where the employee takes unpaid 'FMLA' leave during the week and then works overtime on the weekend to make up his lost wages. The leadership believes he may be running another business during the week. I received approval from Corp

---

[16]    Storck's assertion that Shipton took "full advantage of sick time and unpaid sick time" and used his FMLA "to its fullest" was patently false. Documents reflecting Shipton's actual sick leave usage in 2017 show that he used a total of 232 hours of intermittent sick leave or the equivalent of just 29 days of leave. J.A.697. Shipton's FMLA approval in August 2017 allowed him to take intermittent leave "1-2 times per 4 weeks" for "up to three consecutive calendar days," which amounts to 78 days of protected leave. J.A.181.

OHS to use our Security for surveillance, but they stated that I must first seek your

approval. Any concerns?" *Id.*[17]

When asked about these emails during her deposition, Storck testified that she

did not recall those discussions or placing Shipton under surveillance. J.A.518, 555-

56.[18]  She reiterated that Grosscup reached out to her about Shipton's "pattern of

absences" but struggled to explain the specific nature of his attendance issues and,

in the end, all she could testify to is that Shipton's leadership thought that he used

too much sick leave. J.A.533, 536-37.  When directly asked if there was any evidence

that Shipton was taking unpaid FMLA leave and volunteering to work the weekend

to extend his time off or earn premium pay, she conceded that she never reviewed

his payroll records and she confirmed that he was never disciplined for any such

issues. J.A. 538.  She also admitted that she is not aware of any evidence that he was

working for another business or that he was not actually sick when he used leave.

J.A.538-39, 555-56.

Notably, when Grosscup was asked if he ever talked with Storck about

Shipton's "pattern" of absences, he denied having any conversations at all with

Storck regarding Shipton's attendance and he denied that Shipton had a pattern of

---

[17]    The Exelon Companies did not produce any additional emails or any other documents regarding Storck's surveillance request.

[18]    Storck admitted that she could not recall any other occasion when an employee was placed under surveillance. J.A.518.

"excessive" absences. J.A.453, 455-56.  Instead, he testified that he shared his

concerns that Shipton may be using FMLA leave to extend his weekend and/or to

earn premium pay with Woolford. J.A.281, 450-55.  He admitted that he merely

"assumed" that Shipton was trying to extend his weekend, that the opportunity to

work on the weekend depended on workload and "wasn't an everyday occurrence"

or even available "every weekend," and that he never examined Shipton's payroll

records to determine if he actually made more when he took FMLA leave during the

week and worked the weekend.  J.A.451-52.  He also admitted that he is not aware

of any evidence that Shipton was not actually sick when he took leave or that the

reasons Shipton said that he needed and/or used FMLA leave were fabricated, and

he confirmed that Shipton was never disciplined for any such issues. J.A.450-57.[19]

In short, to this day, neither Storck nor Grosscup can point to any underlying facts

---

[19]    Both Grosscup and Woolford submitted declarations in support of Defendants' summary judgment motion in which they maintained that they "observed that Shipton had a pattern of missing work for sick or FMLA leave around weekends, before or after planned paid time off, and during the week." J.A.278, 281. However, the only occasion they identified when Shipton used FMLA leave prior to planned time off occurred in April 2018, J.A.281, which obviously could not have been the basis for any suspicions they raised with Storck in November 2017.  *Id.* Furthermore, given Grosscup's admission that he never bothered to analyze Shipton's payroll records, J.A.451-52, Grosscup and Woolford's general observation that volunteering to work weekends "allowed Shipton to earn premium pay" is insufficient to establish that they had a factual basis to believe that Shipton was misusing his FMLA leave. J.A.278-79, 281.

demonstrating that they had a legitimate factual basis to believe that Shipton was abusing his FMLA leave.

> **5.** **Grosscup Improperly Considered FMLA Leave When Conducting Shipton's 2017 Performance Review, And Grosscup, Woolford, And Storck Dismissed Shipton's Complaints About His Review**

In early March 2018, Grosscup gave Shipton his annual performance review for 2017 and Shipton received a "B-" rating with respect to his overall performance. J.A.97, 203-09, 305-06. In the review, Grosscup made numerous comments criticizing Shipton's attendance, dependability, and sick leave usage without distinguishing between sick leave that was covered by FMLA and sick leave that was not covered by FMLA. J.A.281, 203-09. As a result of Shipton's mediocre performance rating, he did not receive a step increase and his bonus was reduced. J.A.37, 98, 306, 320, 450, 475.

Grosscup's comments criticizing Shipton's dependability and sick leave usage without differentiating between FMLA leave and other types of leave violated Exelon's Family and Medical Leave Policy, which expressly states that supervisors cannot use the taking of FMLA leave "as a negative factor in employment actions." J.A.652. Further, both Woolford and Storck testified that only unexcused absences should have been noted in the performance review and that FMLA leave and paid time off, including paid sick time, are considered excused absences and should not have been mentioned. J.A.475-76, 537. Although Shipton complained about his

24

review to Grosscup, Woolford and Storck, J.A. 81-86, 89-99, 449-50, 453, 455, 475,[20] his complaints were dismissed and his mediocre performance rating remained unchanged. J.A.89, 98, 455, 475.[21]

### 6.    In April 2018, Shipton Formally Requested To Use Intermittent FMLA Leave For Absences Due To Neuropathy

On April 4, 5, and 6, 2018, Shipton used intermittent FMLA leave because he was experiencing severe foot pain due to neuropathy.  J.A.99-100.  As a result of calling out for three consecutive days prior to a scheduled vacation, he was directed to report for a meeting with Angela Mikulski. J.A.37, 99-100, 633, 710.  During the meeting, he explained that his issue that day was neuropathy and that he was "unable to tolerate pain in [his] feet while standing for long periods of time."  J.A.100, 633.  Mikulski advised him to follow up with Nurse Practitioner Joyce Miskovic

---

[20]    Grosscup confirmed that Woolford and Storck made him aware that Shipton complained. J.A.450, 453.

[21]    Grosscup and Woolford's failure to address Shipton's concerns violated Exelon's Policy Against Discrimination, Harassment, and Retaliation, which states that managers and supervisors who "become aware of conduct that could be discriminatory, harassing, or retaliatory must immediately report the conduct to Human Resources and address the conduct." J.A.328. By its express terms, this policy is "part of Exelon's overall effort to eliminate harassment and discrimination in every form" and sets "expectations that are more stringent than required by law." J.A.325. The policy also states that reports of "harassment, discrimination, or retaliation will be investigated promptly, thoroughly, and impartially" and under the oversight of the Exelon Ethics Department.  J.A.329.  The policy expressly states that belittling, mocking, or other forms of harassing conduct, "even if not based on an individual's or group's legally protected characteristics, [] is inconsistent with Exelon values and expectations and therefore is prohibited." J.A.328.

("Miskovic") when he returned to work to review his medications related to his commercial driving privileges. *Id.*

When Shipton returned to work on April 18, 2018, he was directed to report for a meeting with Miskovic the next day to discuss "glycemic control as related to FMCSA CDL driver standards." J.A.100, 633, 641.[22] During that meeting, Miskovic asserted that the hypoglycemia symptoms described in Hamershock's certifications were "not compatible with safely operating a commercial vehicle according to the FMCSA." J.A.100-01, 290, 633, 641.[23] Shipton explained that he had recently started seeing an endocrinologist "who revamped his treatment plan," that his blood sugars had not been lower than 70-80 mg/dl since starting the new medications, and that he believed that any hypoglycemia symptoms had resolved. J.A.633, 641. He told Miskovic that he believed that Hamershock "just listed all of the symptoms of hypoglycemia." *Id.* He also disclosed that he had been diagnosed with neuropathy and that at that time he was primarily using FMLA when he had "significant nerve pain in his feet that would keep him home from work." *Id.* Miskovic then said that neuropathy could disqualify him from driving a commercial

---

[22]     "FMCSA" refers to the Federal Motor Carrier Safety Administration, which is the federal agency responsible for regulation and oversight of commercial motor vehicles.

[23]     As previously noted, Shipton was already aware that severe symptoms of diabetes could disqualify him from having a commercial driver's license. J.A.237-38.

26

vehicle as well and told him that he would need his endocrinologist to provide a letter of medical clearance. *Id.* She gave him a copy of "the medical examiners handbook section that discusses diabetes to share with his endocrinologist to assist her in clearing him." *Id.*[24] Finally, she informed him that he would not be allowed to drive company vehicles until he was medically cleared. *Id.*

Following Shipton's meeting with Miskovic, he immediately requested the necessary paperwork to apply to use intermittent FMLA leave for neuropathy, and he received written notice from Gagliardo confirming that he met the eligibility requirements for FMLA leave on April 25, 2018. J.A.210-13, 636. On May 9, 2018, he submitted a certification from Dr. Kadambi substantiating his need to use intermittent FMLA leave for neuropathy. J.A.214-18, 633, 636, 640. He also submitted a letter from Dr. Kadambi confirming that he could safely drive a

---

[24]     The FMCSA Medical Examiner Handbook provided guidance for medical examiners who performed commercial driver medical examinations. Miskovic gave Shipton two excerpts from the handbook that address the qualification standards for individuals with diabetes mellitus. J.A.654-76, 732. These materials drew a clear distinction between "mild hypoglycemia" that merely "causes rapid heart rate, sweating, weakness, and hunger" and the type of "severe hypoglycemic reaction" that "can cause symptoms that interfere with safe driving." J.A.657. In addition, the materials plainly state that the FMCSA defines a "severe hypoglycemic reaction" as one that results in seizure, loss of consciousness, the need for assistance from another person, or a period of impaired cognitive function that occurred without warning. J.A.657, 662. Further, the regulations referenced in these materials likewise define the type of "severe hypoglycemic episode" that must be reported in the context of a fitness-for-duty examination as "one that requires the assistance of others, or results in loss of consciousness, seizure, or coma." *See* 49 CFR § 391.46 (e)(1).

commercial vehicle. J.A.219, 633. The letter stated, "I have been seeing Mr. Shipton for diabetes care since March 2018. He has reasonably well controlled diabetes—blood sugars have improved significantly. He has symptoms of peripheral neuropathy but no loss of sensation or joint position sense. He has not had any hypoglycemia since he first saw me." *Id.* On May 23, 2018, the Exelon Companies notified him that his request had been approved. J.A.291-92, 294-97, 636. The approval covered any absences from April 19, 2018 through October 19, 2018. *Id.*[25]

### 7. The Exelon Companies Directed Shipton To Submit A Letter From His Health Care Provider Rescinding The Statements Made In Her Certifications

On May 24, 2018, Shipton had another meeting with Miskovic. J.A.633, 635, 639. During that meeting, Miskovic advised him that the medical clearance letter he submitted from Dr. Kadambi was insufficient and that he had to provide a letter from Hamershock clarifying "the extent of his condition and the effect on his ability to perform his job as it relates to operating a CDL safely," "*rescinding* the original FMLA document" and "the original statements about his condition," and "stating that the symptoms listed did not apply to him personally or something similar to

---

[25]    The Exelon Companies' contemporaneous business records related to Shipton's FMLA application in April 2018 reflect that he requested and received approval to take intermittent FMLA leave for absences due to "peripheral neuropathy." J.A.636.

provide support for his claim that he [was] not at risk of hypoglycemia while driving." J.A.635, 639 (emphasis added).

On June 3, 2018, Shipton submitted a letter from Hamershock in which she wrote, in pertinent part:

> There have been no reported hypoglycemic events in over 2 years. He does not experience any blurred or double vision, paresthesias [sic], dizzy/clammy, sweaty, shaky, headaches, nausea, or vomiting.  He has never as a result of his diabetes or otherwise experienced a seizure, loss of consciousness, required assistance of another, or experienced a period of impaired cognitive function that occurred without warning. Mr. Shipton has not had recurring (2+) disqualifying hypoglycemic reactions within 5 years as listed in FMCSA guidelines…. There is not a risk for sudden death or incapacitation of any kind. Please allow Mr. Shipton to resume driving utilizing [h]is CDL credential immediately and without restriction.

J.A.220, 635, 639. On June 7, 2018, the Exelon Companies notified Shipton, Grosscup, Woolford, and Storck that Shipton had been cleared to operate commercial vehicles for the company. J.A.635, 637.

### 8. Defendants Conducted A "Fact-Finding" Investigation Into Shipton's FMLA Leave Usage When They Knew That There Was An Innocent Explanation For His Conflicting Medical Documentation

Although the Exelon Companies' contemporaneous business records conclusively show that Miskovic directed Shipton to submit the letter from Hamershock rescinding the statements made in her FMLA certifications, the Exelon Companies conducted a "fact-finding" investigation into Shipton's FMLA leave

29

usage based on the alleged "inconsistencies in his medical documentation and FMLA certifications." J.A.712. The investigation was led by Bindu Gross, Jeanne Storck assisted Gross and was present during the fact-finding interview with Shipton, and Michael Grosscup, Angela Mikulski, Kimberly Baudek, and Joyce Miskovic provided relevant documents and information, including, but not limited to, documents and information related to Shipton's absences and leave usage, his FMLA paperwork, and other medical documentation, and records maintained by Exelon OHS, all of which Gross incorporated in the outline he used to question Shipton and memorialize Shipton's responses. J.A. 677-90, 712, 714. Storck also took notes during the fact-finding interview. J.A.691-96.

Gross and Storck's contemporaneous notes from the fact-finding investigation conclusively show that when Shipton was questioned during the investigation he reiterated that he recently "[w]ent to see an endocrinologist who readjusted his medication" and the results had "been good," and that the issue he had been having in the last few months was "foot pain related to neuropathy." J.A.678-79, 683, 691, 695. When Gross asked why he was taking FMLA leave when Dr. Kadambi's certification and Hamershock's letter stated that he had not had any episodes of hypoglycemia, he explained that he understood that his FMLA leave covered any absences related to diabetes, that he had been taking FMLA for absences due to neuropathy, and that he had not been using FMLA leave for hypoglycemia. J.A.686-

30

87, 691, 693. He truthfully reported that he had not had a "hypoglycemic episode" since 2017. J.A.679, 692. Further, he explained that he believed Hamershock's certifications just provided a "generalized statement about diabetes," that what she wrote about his condition in 2017 no longer applied, and that OHS told him that Hamershock had to rescind the statements in the certifications.   J.A.687, 690-91, 694. He also explained that he had never had an episode of neuropathy that would have affected his driving. J.A.694. When Gross asked if the first time he notified anyone at the company about his neuropathy was during the April 6th meeting with Mikulski, he said that he told Grosscup that he had neuropathy in early 2017 and that he notified Grosscup that he was using FMLA leave for foot pain due to neuropathy around the same time that he notified OHS. J.A.680, 692.

Gross and Storck's contemporaneous notes from the fact-finding investigation also conclusively show that both Gross and Storck were aware that OHS told Shipton that Hamershock had to provide a medical clearance letter rescinding the statements made in her prior certifications. J.A.687, 694. The notes show that both of them recognized that the fitness-for-duty letter was governed by FMCSA regulations and standards related to commercial driving privileges.   J.A.683.

Further, during Gross's deposition, he admitted that the evidence obtained in the course of the fact-finding investigation showed that (1) Shipton believed that his FMLA leave covered any diabetes-related absences; (2) he truthfully reported that

he used FMLA leave for neuropathy; (3) his leave records and the information provided by Grosscup and OHS supported his claim that he was using FMLA leave for neuropathy; (4) he submitted a separate certification substantiating his need to use FMLA leave for neuropathy and he received approval to take FMLA leave for neuropathy prior to his discharge; and (5) there was no evidence that he ever took FMLA leave for hypoglycemia when he did not experience hypoglycemia or otherwise provided false information when taking FMLA leave, used FMLA leave when he was not unable to work, used sick leave when he was not sick, or violated the Exelon Companies' procedures for reporting his absences and taking leave in any way. J.A. 566-68, 570, 572-83, 585-86.  Gross also admitted that the only grounds for Defendants' contention that Shipton misused his FMLA leave is the fact that he was using leave for neuropathy when Hamershock's certifications only mentioned that he needed leave for episodes of hypoglycemia.  J.A.574-76, 585.

In addition, Gross candidly acknowledged multiple times that Shipton was honest during the fact-finding investigation. J.A.568 (He "*wasn't dishonest*.  He said, I took the leave but it was for something else…."); 572 (Q: "You testified earlier that Mr. Shipton [] was not dishonest in terms of answering questions about what he'd taken leave for; is that correct? A: Yes."); 586 ("Q: What was Mr. Shipton's response, if you recall, to the question whether he understood that he was permitted to take leave for anything related to diabetes?  A: My recollection is that he said,

32

yeah, he thought he had a blanket—kind of like a blank check. [] Q: Did you think he was being truthful in giving you that response? A: I mean, he later on said he knew that there was a significant difference between both of them. I mean, I don't think that's particularly truthful if you say I think it's different. *But he seemed to believe that*.").[26]

### 9. Defendants Fired Shipton For Misusing His FMLA Leave When They Knew That His Leave Was Used For an Approved Purpose

On June 26, 2018, Shipton received a call from Storck and Woolford notifying him that his employment had been terminated effective that day for "his time off and conflicting paperwork." J.A. 108. He subsequently received a termination letter that stated, "The basis for your termination is related to misuse of sick leave. Our investigation showed that you have requested and taken sick leave and then submitted conflicting medical documentation." J.A. 276.[27] In response to his

---

[26]    Contrary to Gross's deposition testimony and Gross and Storck's contemporaneous notes, the declarations Gross and Storck submitted in support of Defendants' summary judgment motion asserted that "it appeared" that "Shipton was misusing leave" and that he did not provide a "credible" explanation for why Hamershock's certifications stated that he needed leave because he experienced episodes of hypoglycemia due to his diabetes but the subsequent paperwork submitted in support of his ability to hold a CDL stated that he had not experienced any hypoglycemic episodes or any complications related to his diabetes. J.A.283-85.

[27]    According to BGE's interrogatory answers, the decision was made by Grosscup, Woolford, Gross, Storck, Galambos, Byas, and Brian Montgomery, who was then Vice President of Labor Relations at Exelon. J.A.283, 712. However, Grosscup and Woolford testified and maintained in the declarations they submitted in support of Defendants' summary judgment motion that they merely agreed with

application for unemployment benefits, BGE told the Maryland Division of Unemployment Insurance that he was discharged because he "failed to follow instructions." J.A.700.

## III.      Procedural History

On June 26, 2020, Shipton filed his original complaint against the Exelon Companies, Michael Grosscup, Edward Woolford, Jeanne Storck and a fourth individual who was mistakenly named as a defendant in place of Bindu Gross. J.A.4. On December 4, 2020, Shipton filed a motion to amend seeking to file an amended complaint adding Gross to the case in place of the individual who was improperly named as a defendant. *Id.* On December 14, 2020, the district court granted Shipton's motion. *Id.* Defendants filed an answer to the amended complaint on March 2, 2021. J.A.6.

Following discovery, the parties filed cross motions for summary judgment. J.A.752. Defendants argued that Shipton could not prevail on his claims based on the termination of his employment because BGE terminated him based on an honest belief that he misused his FMLA leave and submitted conflicting medical

---

the decision. J.A.279, 281. In addition, while BGE's interrogatory answers made no mention of a lawyer participating in the consensus call regarding Shipton's termination, J.A.710, 712, Gross and Storck testified and maintained in their declarations that an attorney participated in the consensus call. J.A.282-84, 522, 578. In granting summary judgment to Defendants, the district court credited the facts the Individual Defendants attested to in their declarations. J.A.748.

documentation.  Defendants argued that his remaining claims based on events that occurred prior to his termination are time-barred because there is no evidence that any Defendant knowingly or recklessly violated the FMLA and thus there is no basis to apply the FMLA's extended three-year statute of limitations. Defendants also argued that all Defendants except BGE should be dismissed because neither Exelon nor EBSC were his "employer" and there is no evidence that the Individual Defendants were the decisionmakers that decided to terminate him or harbored any retaliatory intent.

Shipton moved for summary judgment on his claims of interference and retaliation based on the termination of his employment arguing that the uncontested evidence shows that Defendants knew that he was using FMLA leave for an approved purpose when they fired him.  Shipton also maintained that he presented sufficient evidence to invoke the FMLA's extended 3-year statute of limitations and show that Exelon, EBSC, and the Individual Defendants were his "employer" within the meaning of the FMLA.

The district court agreed with Defendants on every issue and granted summary judgment to Defendants as to all of Shipton's claims, denied Shipton's cross motion for summary judgment as to his claims based on the termination of his employment, and dismissed his amended complaint in its entirety. J.A.738-39, 753-61. Shipton timely noted this appeal. J.A.740-41.

## SUMMARY OF THE ARGUMENT

The district court erred by applying the "honest belief" doctrine as a defense to Shipton's claims of interference and retaliation based on the termination of his employment when this Court has repeatedly declined to recognize that defense in the context of FMLA claims. When the correct legal standards are applied to the facts of this case, the uncontested evidence establishes that Shipton is entitled to judgment as a matter of law that Defendants unlawfully interfered with his rights and retaliated against him for exercising those rights because he was entitled to take FMLA leave for absences due to neuropathy, he was using his FMLA leave for neuropathy when he was discharged, and Defendants knew that his FMLA leave was used for an approved purpose when they fired him based on pretextual allegations that he misused his leave. Given the evidence and Gross and Storck's contemporaneous notes from the fact-finding investigation as well as Gross's subsequent deposition testimony conclusively proving that Defendants knew that Shipton's leave was used for an FMLA-qualifying reason when they fired him, no jury could reasonably believe that BGE terminated Shipton's employment because Defendants had an "honestly-held belief" that he was misusing his FMLA leave. Furthermore, because the uncontested evidence shows that Defendants knowingly violated the FMLA, the district court also erred in finding Shipton's remaining claims are time-barred due to his failure to present any evidence of willfulness.

36

## ARGUMENT

### I.    Standard of Review

The Court reviews a district court's grant of summary judgment *de novo*, "applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 208 (4th Cir. 2017) (quoting *T-Mobile Ne., LLC v. City Council of Newport News*, 674 F.3d 380, 384-85 (4th Cir. 2012)). Summary judgment is appropriate if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

### II.    The District Court Erred In Granting Summary Judgment To Defendants And Denying Shipton Summary Judgment As To His Claims Based On The Termination Of His Employment

The Family and Medical Leave Act provides covered employees with "12 workweeks of leave during any 12-month period" for family-related reasons or for an employee's serious health condition that renders him unable to do his job. 29 U.S.C. § 2612(a)(1). Congress enacted the FMLA to "balance the demands of the workplace with the needs of families," "to entitle employees to take reasonable leave for medical reasons," to accomplish these purposes "in a manner that accommodates the legitimate interests of employers," and "to promote the goal of equal employment opportunity." 29 U.S.C. § 2601(b)(1), (2), (3), (5). In doing so, Congress specifically recognized that "there is inadequate job security for employees

37

who have serious health conditions that prevent them from working for temporary periods." *Id.* § 2601(a)(4). In that regard, Congress required employers to allow an eligible employee who is unable to perform the functions of his position because of a "serious health condition" to request to take leave "intermittently" when "medically necessary" and "supported by a certification" from the employee's health care provider. *Id.* §§ 2612(a)(1)(D), (b)(1), 2613.

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). As this Court has explained, "[t]he substantive rights guaranteed by the FMLA are *prescriptive*, and a plaintiff seeking redress for employer interference with an entitlement is only required to show that he or she qualified for the right that was denied." *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 203 (4th Cir. 2016) (citing *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006)).

The FMLA also provides that "[i]t shall be unlawful for any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). This limitation on employers is *proscriptive*. *Yashenko*, 446 F.3d at 546. Unlike prescriptive entitlement or interference claims, employer intent is relevant here. *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir. 1998); *Rice v. Sunrise Express, Inc.,*

38

209 F.3d 1008, 1017 (7th Cir. 2000). This Court has read § 2615(a)(2) broadly to protect not just employees who "oppose" unlawful practices, but also to protect "employees from discrimination or retaliation for exercising their substantive rights under the FMLA," and has held that claims of retaliation for taking leave arise under that subsection. *Yashenko*, 446 F.3d at 546, 551. *See also Sharif,* 841 F.3d at 203. Further, the regulations expressly state that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *See* 29 C.F.R. § 825.220(c).

In both contexts, a plaintiff can either (1) produce direct and indirect evidence of retaliatory animus or (2) "demonstrate intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in *McDonnell Douglas*." *Fry v. Rand Constr. Corp.,* 964 F.3d 239, 244 (4th Cir. 2020) (quoting *Waag v. Sotera Defense Solutions, Inc.,* 857 F.3d 179, 191 (4th Cir. 2017). *See also Laing v. Federal Express Corp.,* 703 F.3d 713, 717 (4th Cir. 2013); *Yashenko*, 446 F.3d at 550-51.

The FMLA does not prevent "an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." *Fry,* 964 F.3d at 249 (quoting *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 304-05 (4th Cir. 2016)). *See, e.g., Mercer v. Arc of Prince Georges County, Inc*., 532 Fed. Appx. 392, 396-97 (4th Cir. 2013) ("An employer has discretion to discipline or terminate

39

the employment of an at-will employee for poor performance regardless of whether the employer's reason for terminating the employment was discovered while the employee is taking FMLA leave."); *Laing* , 703 F.3d at 723-24 ("[T]he FMLA does not preclude an employer from placing an employee on an investigatory suspension upon her return from [FMLA] leave if it would have taken the same action had the employee never taken leave in the first place."); *Calhoun v. United States DOL*, 576 F.3d 201, 214 (4th Cir. 2009) (holding failure to follow supervisor's instructions was insubordinate behavior that amounted to a legitimate, non-retaliatory reason for adverse employment action); *Yashenko,* 446 F.3d at 549-50 (holding that an employer does not interfere with the exercise of FMLA rights where it reorganizes during an employee's leave and eliminates that employee's position as a result of legitimate non-FMLA leave concerns).

### A.    The District Court Erred In Applying The "Honest Belief" Doctrine As A Defense To Shipton's FMLA Claims

As a preliminary matter, the district court failed to apply the correct legal standards in analyzing Shipton's FMLA claims based on the termination of his employment.  The district court determined that Shipton cannot prevail on his claims of interference and retaliation based on his termination because the undisputed material facts show that Defendants terminated him "based upon the honestly-held belief" that he "had misused his FMLA leave in early 2018 and submitted conflicting medical documentation regarding his hypoglycemia." J.A.755. In doing so, the

40

district court relied on this Court's decision in *Mercer v. Arc of Prince George's Cnty*., 532 F.App'x 392 (4th Cir. 2013), which the district court cited for the proposition that "an employer does not interfere with the exercise of FMLA rights where it terminates an employee's employment based on the employer's honest belief that the employee is not taking FMLA for an approved purpose." J.A. 750-51 (citing *Mercer*, 532 F. App'x at 396 (citing *Kariotis v. Navistar Int'l Transp. Corp*., 131 F.3d 672, 680–81 (7th Cir.1997)).

The district court specifically relied on *Mercer* in rejecting Shipton's argument that "his termination was improper" because "the evidence establishes that he was entitled to take FMLA leave for absences due to symptoms related to his *diabetes*," reasoning that "Plaintiff's disagreement with Defendants regarding the scope of his FMLA leave in early 2018 does not refute the evidence [] showing that Defendants honestly *believed* that he misused his FMLA leave and submitted conflicting medical documentation regarding his hypoglycemia." J.A.757-58.  The district court also cited *Mercer* as support for its conclusion that Shipton "cannot meet his burden to establish that the stated reason for his termination was pretext for FMLA retaliation" because "Defendants need only have had an honest belief that the alleged reason or misconduct occurred to meet their burden of providing a non-discriminatory explanation for the termination" and Shipton "points to no facts or evidence to substantiate" his claim that his termination was "the culmination of a

persistent campaign of unwarranted scrutiny and false and baseless accusations that he misused his leave" predicated on "nothing more than his taking FMLA leave." J.A.759.

Contrary to the district court's suggestion, the Court in *Mercer* did not endorse or approve of the application of the "honest belief" defense to FMLA interference claims. The language the district court attributed to this Court actually describes the holding of the *Kariotis* case, which was merely cited by the Court in *Mercer* as an example of the other cases in which courts have held that "an employer has discretion to discipline or terminate the employment of an at-will employee for poor performance regardless of whether the employer's reason for terminating the employment was discovered while the employee is taking FMLA leave." *Mercer*, 532 F.App'x at 396-97. Further, this Court has repeatedly declined to address whether the "honest belief" doctrine applies to interference claims or retaliation claims under the FMLA. *See Adkins v. CSX, Transp., Inc*., 70 F.4th 785, 795 (4th Cir. 2023) ("The law is unsettled on application of the honest belief doctrine as a defense to an FMLA interference claim," "we have not yet addressed the issue," and "[w]e need not [] do so here…."); *Sharif,* 841 F.3d at 203 (noting that the parties had argued extensively over the application of the "so-called 'honest belief' rule" to the plaintiff's FMLA retaliation claim and saying that the issues in that case were "most

42

profitably addressed through the well-established proof scheme of *McDonnell Douglas* and its progeny").

However, by applying the "honest belief" doctrine as a defense to Shipton's interference claim, the district court improperly required Shipton to disprove Defendants' assertion that they had an "honest belief" that he misused his FMLA leave without critically examining whether Defendants provided a legitimate, nondiscriminatory explanation for his termination much less any evidence that would be sufficient to show that they had an "honest belief" that he was not taking FMLA leave for an approved purpose.

> **B.** **Shipton Presented Direct Evidence That Defendants Deliberately Interfered With His FMLA Rights And Retaliated Against Him For Exercising His FMLA Rights When They Fired Him**

Based on the standards this Court has established for the analysis of FMLA claims, a plaintiff can establish both kinds of claims by providing direct evidence of discrimination or satisfying the burden-shifting framework set forth in *McDonnell Douglas*. *Fry,* 964 F.3d at 244. Although Shipton's claims should survive under either approach, the district court principally erred in awarding summary judgment to Defendants and denying Shipton summary judgment as to his claims based on the termination of his employment because it failed to consider the direct evidence Shipton presented conclusively showing that Defendants deliberately terminated him when they knew that he was taking FMLA-protected leave.

43

The district court failed to consider the Exelon Companies' contemporaneous business records conclusively establishing that Shipton requested and received approval to take FMLA leave for absences due to diabetes and separately requested and received approval to take FMLA leave for absences due to neuropathy, and failed to consider Gross and Storck's contemporaneous notes from the fact-finding investigation conclusively showing that he was taking FMLA leave for neuropathy, that he was not using FMLA leave for hypoglycemia, and that Defendants knew that his FMLA leave was used for neuropathy when they fired him. J.A.631-32, 636, 638, 643, 686-87, 691, 693.

The district court failed to consider Gross's deposition testimony in which he admitted that the evidence obtained and reviewed in the course of the fact-finding investigation showed that Shipton genuinely believed that his FMLA leave covered any diabetes-related absences and truthfully reported that he used FMLA leave for neuropathy, his leave records and the information provided by Grosscup and Exelon OHS supported his claim that he was using FMLA leave for neuropathy, he submitted a separate certification substantiating his need to use FMLA leave for neuropathy and he received approval to take FMLA leave for neuropathy prior to his discharge, and there was no evidence that he ever took FMLA leave for hypoglycemia when he did not experience hypoglycemia or otherwise  provided false information when taking FMLA leave, used FMLA leave when he was not

44

unable to work, used sick leave when he was not sick, or violated the Exelon Companies' procedures for reporting his absences and taking leave in any way. J.A. 566-68, 570, 572-83, 585-86.   The district court also overlooked Gross's candid admissions demonstrating that the only factual basis for Defendants' contention that Shipton misused his FMLA leave is the fact that he was using FMLA for neuropathy when Hamershock's certifications only mentioned that he needed leave for episodes of hypoglycemia.  J.A.574-78.

The contemporaneous documents and admissions by the Exelon Companies' lead investigator and one of the decisionmakers that decided to terminate Shipton's employment are direct evidence that Defendants knowingly terminated Shipton for taking FMLA-protected leave.  *See Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir. 2006) (noting that direct evidence encompasses "conduct or statements" that "bear directly on the contested employment decision.") (internal quotation marks omitted).

### C.    Defendants Cannot Meet Their Burden Of Providing A Legitimate, Nondiscriminatory Reason For Shipton's Termination And, Even If They Can, There Is Ample Evidence Of Pretext

The district court also erred in finding that Defendants met their burden of providing a legitimate, nondiscriminatory reason for Shipton's termination. The district court concluded that Defendants "have advanced a legitimate, non-discriminatory reason for terminating Plaintiff's employment" because it found that (1) "the reason given for Plaintiff's FMLA leave request in 2017 was his episodes of hypoglycemia," (2) "Defendants reasonably believed that Plaintiff requested FMLA leave to address symptoms related to his hypoglycemia," (3) "Defendants had an honest belief that the medical documentation that Plaintiff submitted in May 2018 to reinstate his CDL conflicts with the two health certifications [] with regards to whether Plaintiff suffered from episodes of hypoglycemia," and (4) "Defendants found the letters from Plaintiff's medical providers to be inconsistent with Plaintiff's prior FMLA health certification" and "with Plaintiff's FMLA absences in early 2018" because "Plaintiff had taken FMLA leave for episodes of hypoglycemia in March 2018 and May 2018." J.A. 755-56, 759. However, each of these factual findings is directly contradicted by the objective evidence in the record.

The Exelon Companies' contemporaneous business records conclusively show that Shipton requested and received approval to use intermittent FMLA leave for absences due to diabetes, not merely for episodes of hypoglycemia, and that he

separately requested and received approval to use intermittent FMLA leave for absences due to neuropathy. J.A.631-32, 636, 638, 643. The Exelon Companies' contemporaneous business records also conclusively show that the Exelon Companies directed Shipton to provide the letter from Hamershock rescinding the statements made in her prior certifications. J.A.635, 639. Further, the evidence obtained and reviewed during the fact-finding investigation, including Shipton's leave records and his communications with Grosscup, the contemporaneous notes from the fact-finding investigation, and Gross's subsequent deposition testimony conclusively show that Defendants knew that Shipton's leave was used for neuropathy, not for hypoglycemia, and that there is no evidence that Shipton ever took FMLA leave for hypoglycemia when he was not experiencing hypoglycemia. J.A. 566-68, 570, 572-83, 585-86, 585.

The district court clearly erred in determining that Defendants met their burden of providing a nondiscriminatory explanation for Shipton's termination when the uncontroverted evidence conclusively proves that they knew that he was taking leave for an FMLA-qualifying reason. Moreover, given the evidence conclusively proving that Defendants knew that Shipton's leave was used for an approved purpose when they terminated him, no jury could reasonably believe that Defendants terminated Shipton because they had an "honestly-held belief" that he was misusing his FMLA leave.

47

In addition to erroneously requiring Shipton to show pretext when Defendants failed to meet their burden of providing a nondiscriminatory reason for his termination, the district court also erred in finding Shipton failed to establish that Defendants' stated reason for his termination was pretextual. In evaluating employer intent and the question of pretext, the district court may consider "among other things, the historical background of the … decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from the normal procedural sequence; and . . . [any] contemporary statements by members of the decisionmaking body." *See Reno v. Bossier Parish Sch. Bd*., 520 U.S. 471, 489 (1997) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 267-68 (1977)).

Gross's admission that the only factual basis for Defendants' contention that Shipton misused his FMLA leave is the fact that he was using FMLA for neuropathy when Hamershock's certifications only mentioned that he needed leave for episodes of hypoglycemia is, by itself, sufficient evidence to show that the Exelon Companies' decision to fire Shipton for "misuse of leave" was dishonest and was not the real reason for his termination, which is all that is required at step three of the burden-shifting framework. *See Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 296 (4th Cir. 2010) (observing that the employer's proffered explanation may not be worthy of credence when "facts, if believed, would allow a trier of fact to think [the employer] was simply looking for a reason to get rid of [the

48

employee]"); *Laing*, 703 F.3d at 722 (noting that when disciplinary action is "based on little evidence of wrongdoing, a genuine issue might exist as to pretext.").

Furthermore, besides showing that Defendants' assertion that Shipton misused his FMLA leave was false, Shipton also presented evidence that Defendants were hostile to his use of FMLA leave, including, but not limited to, evidence that Grosscup, Woolford, and Storck previously made false allegations that he misused his FMLA leave based on nothing more than his taking FMLA leave, that Grosscup, Woolford, and Storck improperly dismissed his complaints challenging his performance reviews that inappropriately considered his FMLA leave, which violated the Exelon Companies' antidiscrimination policies, and that Grosscup failed to inform him that he could use FMLA leave for absences due to diabetes until he had nearly exhausted his leave allotment, inappropriately considered his FMLA leave when conducting his performance reviews, which violated the Exelon Companies' FMLA policy, pressured him to limit his use of FMLA, and played one of his call-out messages in front of co-workers and said he should be fired. J.A.16, 80-86, 97, 99, 102, 111, 203-09, 305-06, 449, 644. Even if Shipton has not established that he is entitled to judgment as a matter of law, he has at least demonstrated that a reasonable factfinder could conclude that Defendants terminated him for exercising his rights under the FMLA. Accordingly, the district court erred

in granting summary judgment to Defendants and denying Shipton summary

judgment as to his claims based on the termination of his employment.

> **III.** **The District Court Erroneously Found Shipton's Claims Based On Events Prior To His Termination Are Time-Barred Because It Ignored The Uncontroverted Evidence Showing That Defendants Willfully Violated The FMLA**

The general statute of limitations under the FMLA is two years. *See* 29 U.S.C.

§ 2617(c)(1). However, the FMLA allows for the statute of limitations to be

extended to three years if the employer willfully violated the FMLA. *See* 29 U.S.C.

§ 2617(c)(2). Although Congress did not define "willful" in the context of the

FMLA, many courts have used the definition that applies to claims under the Fair

Labor Standards Act as established in *McLaughlin v. Richland Shoe Co*., 486 U.S.

128, 131-33 (1988), which requires the employee to demonstrate that the employer

"either knew or showed reckless disregard for the matter of whether its conduct was

prohibited by the statute." 486 U.S. at 132-35.

The district court determined that the two-year statute of limitations applies

and precludes Shipton's claims based upon events that occurred prior to his

termination because it found that the undisputed material facts show that Defendants

did not willfully violate the FMLA. J.A.753. More specifically, the district court

concluded that Shipton cannot show that Defendants willfully violated the FMLA

because BGE repeatedly granted his requests for FMLA leave starting in 2015 and

Grosscup encouraged him to request FMLA leave in 2017. J.A.754.

However, the district court improperly resolved disputed facts in favor of Defendants and discounted the evidence Shipton pointed to showing that his supervisors failed to give him any information regarding his right to use intermittent FMLA leave for absences due to diabetes for over two years and that Grosscup was particularly hostile towards him because of his use of intermittent FMLA leave, including evidence showing that Grosscup did not provide any information regarding his right to use intermittent FMLA for diabetes for over seven months even though he specifically informed Grosscup that nearly all of his absences were for diabetes and Grosscup falsely accused him of misusing his leave, gave him a mediocre performance review based, in part, on his use of FMLA leave, ignored his complaints challenging the review, pressured him to limit or reduce his FMLA leave usage, and played one of his call-out messages in front of co-workers, laughed, and said he should be fired. J.A.16, 80-89, 97-99, 102, 111, 203-09, 305-06, 449, 644.

Further, the district court overlooked the uncontroverted evidence conclusively proving that Defendants knew that Shipton was taking leave for an FMLA-qualifying reason when they fired him based on pretextual allegations that he was misusing his FMLA leave.  J.A. 566-68, 570, 572-83, 585-86, 585.  Based upon the standard adopted by the Supreme Court in *McLaughlin*, Shipton has presented ample evidence that Defendants "either knew or showed reckless disregard" as to whether their actions violated the FMLA.  486 U.S. at 132-35.

Accordingly, the district court erred in finding that Shipton's claims based on events that occurred prior to his termination were time-barred.

## IV.    The District Court Erroneously Found Exelon, EBSC And The Individuals Were Not Shipton's "Employer" Under The FMLA

The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I).

In determining that BGE is the only proper defendant under the FMLA, the district court agreed with Defendants' argument that Exelon and EBSC are not proper defendants because BGE is the entity that employed Shipton. J.A.754. The district court also agreed with Defendants' argument that the Individual Defendants are not proper defendants because none of them "had a decisive role in the decision to grant or deny Plaintiff's FMLA leave requests, or to terminate Plaintiff's employment." J.A.754.  The district court noted that Grosscup and Woolford did not participate in the fact-finding interview and that several others participated in the consensus call where Gross and Storck discussed the termination decision. *Id.* The district court did not discuss the evidence Shipton presented to counter Defendants' arguments.

52

Contrary to the district court's analysis, the regulations applicable to the FMLA expressly provide for separate legal entities to be treated as a single employer "[w]here one corporation has an ownership interest in another corporation" and meets the "joint employment" test discussed in § 825.106. A joint employment relationship generally will be considered to exist in situations where "the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer." § 825.106(a)(2). Furthermore, the regulations specifically provide that "[i]ndividuals acting in the interest of an employer, such as corporate officers, supervisors and managers, can be held individually liable for violations of the FMLA." 29 C.F.R. § 825.104(d).

As to Exelon and EBSC, there is substantial evidence that Exelon directly and indirectly, through EBSC, exercises significant control over BGE's employees, including, but not limited to, promulgating policies and rules, employee supervision and discipline, and maintenance of employee records. J.A.38-39, 325-421, 645-653. Exelon developed the companywide policies and Code of Business Conduct that apply to all employees of BGE and that governed the employees' actions in this case. J.A.326, 342, 646. Exelon also provides BGE with human resources and legal support/oversight, including performing administrative functions related FMLA

leave and maintaining records related to such requests. J.A. J.A.166-202, 210-18, 282-83, 291-99, 570, 629-43.  EBSC played a major part in the events leading up to Shipton's termination by virtue of Bindu Gross's decisive role in the fact-finding investigation and direct participation in the termination decision.  J.A.677-90, 712-14.  In addition, as to Grosscup, Woolford, and Storck, there is substantial evidence that all three of them played an active part in the events that culminated in Shipton's termination, including, but not limited to, persistently targeting Shipton for baseless allegations that he was abusing his FMLA.  Given this evidence and in light of the regulations, the district court erred in concluding that Exelon, EBSC, and the Individual Defendants are not proper defendants under the FMLA.

## CONCLUSION

For the foregoing reasons, Shipton respectfully requests that the Court reverse and vacate the district court's grant of Defendants' summary judgment motion, reverse the district court's denial of Shipton's cross motion for summary judgment, and remand the case to the district court with instructions to enter judgment in Shipton's favor on his interference and retaliation claims based on his termination and allow the case to proceed to trial on his remaining claims and as to damages only with respect to the termination.

Dated:  September 15, 2023                    Respectfully submitted,


                                               /s/ Tonya Baña

54

Tonya Baña
4305 Saint Paul Street
Baltimore, Maryland 21218
Telephone: (443) 890-8000
Facsimile: (410) 670-7573
Email: tonya@tonyabana.com

*Attorney for Plaintiff-Appellant*

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument pursuant to Local Rule 34(a).

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that this brief complies with the type-volume limits established by Fed. R. App. R. 32 because, excluding the cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, certificates of counsel, and signature block, the brief contains no more than 13,000 words. This brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: September 15, 2023

/s/ Tonya Baña

*Attorney for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2023, I electronically filed the foregoing Opening Brief of Plaintiff-Appellant with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Tonya Baña